UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| DARLENE BURNETT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 4:09-CV-1087 (CEJ) |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social ) | |
| Security, ) | |
| Defendant. ) | |

# MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I. Procedural History

On December 6, 2006, plaintiff Darlene Burnett filed an application for a period of disability and disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ *et seq.*, with an alleged onset date of September 29, 2005. (Tr. 15, 75-81). After plaintiff's application was denied on initial consideration (Tr. 44-48), she requested a hearing from an Administrative Law Judge (ALJ). (Tr. 51).

The hearing was held on October 16, 2008. Plaintiff was represented by counsel. (Tr. 21-41). The ALJ issued a decision on January 27, 2009. (Tr. 10-20). The Appeals Council denied plaintiff's request for review on May 26, 2009. (Tr. 8-9). Accordingly, the ALJ's decision stands as the Commissioner's final decision. See 42 U.S.C. § 405(g).

## II. Evidence before the ALJ

Plaintiff was born on February 11, 1963. (Tr. 25). At the time of the hearing, plaintiff was married and lived in a house with her husband and three children. (Tr. 26). Plaintiff testified that a "homeless couple" had been living with her family for

three weeks and helped with housework. Plaintiff has a high school education and is able to read, write, and do math. (Tr. 26-27). Plaintiff was approximately five feet five inches tall and she weighed approximately 170 pounds. (Tr. 27). Plaintiff was unemployed, but she had worked as a nurse's aide in a nursing home for about a year or two. (Tr. 28). Until March 2000, plaintiff worked at Clumco, where she built sandblasting equipment. Id. Plaintiff stopped working at Clumco because she was pregnant. Id.

Plaintiff testified that she was injured while taking her youngest child to preschool in September 2005. (Tr. 29). Plaintiff slipped on the school steps, and injured her back and shoulder. Id. An ambulance transported her to Sullivan Hospital, where she was given morphine, but she was not examined by a doctor. (Tr. 30). The hospital released plaintiff, but she was unable to walk. Id. Two days later, plaintiff attempted to drive her car, but her "back locked up again[.]" Id. An ambulance was called and transported plaintiff to Washington Hospital where x-rays were taken. (Tr. 30-31).

Plaintiff then visited her regular doctor, Dr. Simckes, an obstetrician/gynecologist. (Tr. 31). On October 3, 2005, plaintiff underwent a magnetic resonance imaging (MRI) scan, and Dr. Simckes discussed the results with plaintiff. (Tr. 31). Dr. Simckes referred plaintiff to Dr. Chen, who gave plaintiff steroid injections to relieve her pain. (Tr. 32). Plaintiff testified that, at the end of 2005, she "was pretty much bedridden [because she] could not drive [or] do anything." (Tr. 33). Dr. Chen prescribed pain medication, but plaintiff explained that "it did not work." Id. Dr. Granberg administered her injections. Id.

Plaintiff visited Dr. Simckes again, who then referred her to a neurosurgeon, Dr. Levy. (Tr. 31, 33). On February 18, 2006, plaintiff underwent a second MRI. (Tr. 31-

33). Dr. Levy recommended a series of injections for plaintiff's back. (Tr. 33). Plaintiff testified that the injections did not relieve her back pain. Id.

At the end of 2006, Dr. Levy performed surgery on plaintiff and placed two eight-inch rods and six screws in her back. (Tr. 34). Plaintiff testified that the surgery made her condition worse. (Tr. 35). In fact, she experienced "restless leg syndrome constantly [and] the pain just [would] not go away." Id.

Plaintiff testified that she and her husband lost their home and the surrounding land "because [her] husband had to be out of work to take care of [her] and the kids." Id. At the time of the hearing, plaintiff's husband was employed, and they were renting a house for $500 per month. Id.

Plaintiff testified that she experienced constant pain that felt "[l]ike pitchfork stabbing in [her] back right above [her] hip bones on both sides." (Tr. 36). Plaintiff described the pain as a ten on a ten-point scale. Id. Plaintiff took Narco[1] so that she could walk around. (Tr. 37). Plaintiff explained that, sometime after the hearing, Dr. Levy planned to remove the rods in her back and "put a cage in." (Tr. 35).

Plaintiff testified that she was able to "[v]ery little" around the house, and that she used a stool to wash dishes and cook. (Tr. 37). To relieve the pain in her back and legs, plaintiff used a cane and a walker. Id.

Plaintiff reported that she enjoyed deer hunting, but that she had not hunted since her accident. (Tr. 38). Plaintiff could only drive for half an hour. Id. To control her pain, plaintiff testified that she lies down for at least four hours a day. Id. For the rest of the day, plaintiff cleaned dishes and prepared dinner. (Tr. 39). When plaintiff attended church, she sat in a "special chair[.]" Id. After church, plaintiff took pain

---

[1]Presumably, plaintiff was referring to "Norco," which is a combination of hydrocodone and acetaminophen. See Phys. Desk. Ref. 3188 (63rd ed. 2009).

-3-

pills and prepared meals. Id. Plaintiff reported that the pain woke her up at 3:00 a.m., and that she would crochet or cross stitch to pass the time. (Tr. 40). Plaintiff shopped for groceries, but was unable to carry them into the house. Id.

### III. Medical Evidence

On September 28, 2005, plaintiff was taken to the emergency room at Missouri Baptist Hospital in Sullivan, Missouri. (Tr. 193). Mohammed N. Islam, M.D., noted that plaintiff fell and injured her back on the concrete steps. Id. The medical records indicate that plaintiff could not move her head, experienced lower back pain into her right hip, and was unable to straighten her legs without pain. (Tr. 194). Plaintiff was given Toradol,[2] Demerol,[3] and Phenergan.[4] (Tr. 195). X-rays of plaintiff's cervical spine, hips, and elbows revealed no abnormalities. (Tr. 198, 200-203).

On October 3, 2005, plaintiff underwent an MRI scan of her lumbar spine. (Tr. 169). The test revealed the following:

> The signal intensity of the conus medullaris is normal. No significant disc abnormalities are present at L1-2, L2-3, or L3-4. At L4-5[,] there is minimal posterior disc bulging with a left lateral foraminal disc protrusion as well as posterior high intensity zone. At L5-S1[,] there is a central disc protrusion with posterior high intensity zone.

(Tr. 169).

---

[2]"Toradol is the "trademark for preparation of ketorolac tromethamine," which is "a nonsteroidal antiinflammatory drug administered intramuscularly, intravenously, or orally for short-term management of pain[.]" See Dorland's Illustrated Med. Dict. 1966, 998 (31st ed. 2007).

[3]Demerol is the "trademark for preparations of meperidine hydrochloride[,]" which is "a synthetic opioid analgesic, used as an analgesic to relieve moderate to severe pain, including during childbirth, and as an adjunct to anesthesia; administered orally, intramuscularly, subcutaneously, or intravenously." See Dorland's Illustrated Med. Dict. 492, 1153 (31st ed. 2007).

[4]Phenergan is the "trademark for preparations of promethazine hydrochloride[,]" which is "a phenothiazine derivative having marked antihistaminic activity as well as sdeative and antiemetic action[.]" See Dorland's Illustrated Med. Dict. 1448, 1549 (31st ed. 2007).

On December 31, 2005, plaintiff's insured status under the Social Security Act expired. (Tr. 83).

On, February 18, 2006, an MRI of plaintiff's lumbar spine revealed that there was no significant disc abnormality at L1-2, L2-3, or L3, and that:

> At the L4-5[,] there [was] minimal posterior disc bulging[,] a posterior high intensity zone within the intervertebral disc laterally in the left neural foramen consistent with partial annular tear.
>
> At the L5-S1[,] there is a posterior disc bulging with a central disc protrusion and posterior high intensity zone consistent with annular tear.

(Tr. 167).

On February 22, 2006, plaintiff sought treatment from Armond L. Levy, M.D. (Tr. 216). Plaintiff complained of "lumber spine symptoms [and] bilateral leg tingling." Id. Plaintiff reported that her pain began after her fall in September 2005. Id. Dr. Levy noted that plaintiff's pain was in her lower lumbar region, radiating into her legs, and that the symptoms subsided when she lay down. Id. Plaintiff's past medical history included depression. Id. Dr. Levy reported that plaintiff experienced mood swings with depressive symptoms, was histrionic, overweight, and her deep tendon reflexes were symmetric. (Tr. 216-17). Dr. Levy noted that plaintiff's MRI "show[ed] mild degenerative disc disease at L4-5 and L5-S1[, and] recommended epidural steroid injections, trigger injections, and exercise/physical therapy." (Tr. 217).

On March 3, 2006, plaintiff saw Dr. Zhenhuan Chen, M.D., at St. John's Mercy Hospital. (Tr. 159-60). Plaintiff complained of lower back pain for the past five months, which had recently worsened. (Tr. 159). Plaintiff's medications included

Prozac[5] and hydrocodone.[6]  Id.  Upon physical examination, Dr. Chen diagnosed plaintiff with lumbar radiculopathy.  Id.  Dr. Chen gave plaintiff an epidural steroid injection, and noted that her "pain was gone after [the] injection [as] compared to her 6/10 pain score when she walked in."  (Tr. 160).  On March 13, 2006, plaintiff visited St. John's Mercy Medical Center, complaining of numbness of her left leg and severe back pain which was "complicated with alternative bilateral posterior leg pain, more on [the] right."  (Tr. 149, 152).  Plaintiff reported no significant pain after her first epidural injection, but Dr. Chen observed that plaintiff experienced "severe tenderness at her bilateral SI joint lines."  (Tr. 152).  Dr. Chen diagnosed plaintiff with lumbar radiculopathy and possible SI joint arthropathy, and administered an epidural injection.  Id.

On March 21, 2006, plaintiff visited Dr. Levy, complaining that the epidural injections increased her back pain.  (Tr. 218).  Dr. Levy noted that plaintiff "was offered 'surgery' at the right SI joint by her pain doctor[, and] recommended exercise/physical therapy[,] SI injections and/or rhizolysis."[7]  Id.  That same day, plaintiff visited Dr. Chen, and "demonstrate[d] significant tenderness at [her] bilateral SI joint lines, more severe at right."  (Tr. 145).  Dr. Chen diagnosed her with "[b]ilateral SI joint arthropathy, and lumbar radiculopathy."  Id.

---

[5]Prozac, or fluoxetine, is a psychotropic drug indicated for treatment of, *inter alia*, major depressive disorder.  See Phys. Desk. Ref. 1772-72 (60th ed. 2006).

[6]Hydrocodone is "a semisynthetic opioid analgesic derived from codeine but having more powerful sedative and analgesic effects."  See Dorland's Illustrated Med. Dict. 890 (31st ed. 2007).

[7]Rhizolysis refers to "percutaneous radiofrequency rhizotomy[,]" which is a type of "interruption of a cranial or spinal nerve root[.]"  See Dorland's Illustrated Med. Dict., 1666 (31st ed. 2007).

On September 21, 2006, plaintiff underwent an MRI of her lumbar spine, which revealed "no interval change in the lumbar spine with disc bulging at L4-5 and L5-S1 with a tiny stable central disc protrusion at L5-S1 without nerve root impingement, canal or forminal stenosis in the lumbar spine." (Tr. 175).

A CT scan of plaintiff's lumbar spine was performed on October 23, 2006. (Tr. 176). The test revealed that there was a "grade II degenerated disc at the L3-4 interspace and a grade V degenerated disc at the L4-5 interspace [as well as] partial opacification of the outer margin of the L5-S1." Id.

On October 31, 2006, plaintiff saw Dr. Levy for a follow-up visit after undergoing a discography.[8] (Tr. 222). Dr. Levy noted that plaintiff was "histrionic," and he assessed her with degenerative disc disease. Id. On November 30, 2006, Dr. Levy performed back surgery on plaintiff. (Tr. 18, 223).

On December 5, 2006, plaintiff was taken to the emergency room at the Missouri Baptist Hospital. (Tr. 179). The medical records indicate that plaintiff experienced lower extremity edema,[9] she had slept in a chair with her legs hanging down, and that she had undergone a laminectomy.[10] Id. The emergency room physician diagnosed plaintiff with dependent edema of the lower extremities and lower back pain. (Tr. 180). Two days later, plaintiff was admitted to St. Anthony's Medical

---

[8]Discography refers to "[h]istorically, radiographic demonstration of interverebral disk by injection of contrast media into the nucleus pulposus." See PDR Med. Dict. 550 (3d ed. 2006).

[9]Edema refers to "[a]n accumulation of an excessive amount of watery fluid in cells or intercellular tissues." See PDR Med. Dict. 612 (3d ed. 2006).

[10]Laminectomy refers to "[e]xcision of a vertebral lamina; commonly used to denote removal of the posterior arch." See PDR Med. Dict. 1046 (3d ed. 2006).

Center, because of disc displacement. (Tr. 207). There, she underwent a microlumbar discectomy.[11] (Tr. 208).

On December 12, 2006, plaintiff saw Dr. Levy for a follow-up visit. (Tr. 225). Plaintiff reported "right lower lumbar pain with occasional radiation to the right leg." Id. Dr. Levy noted that she had a normal range of motion in her back, full range of motion in the right and left upper extremities, and normal strength and tone in the right and left upper extremities. Id. Dr. Levy recommended Soma[12] for muscle spasm and Percocet[13] for pain, and advised plaintiff to seek outpatient physical therapy for gentle exercise. (Tr. 225).

At a January 16, 2007 postoperative visit, Dr. Levy noted that plaintiff experienced weakness in her right leg, and "tenderness to touch of her right buttock extending to the anterior portion of her right thigh and knee." (Tr. 292). Plaintiff had "occasional throbbing pain in . . . both her legs[, and] was only able to participate in physical therapy for one home session due to financial considerations." Id. Dr. Levy noted that she was "ambulating without any assistance[, and she] continue[d] to take Vicodin[14] for pain and Soma for spasm. Id. Plaintiff exhibited normal muscle strength, tone, and no atrophy in her extremities. (Tr. 292-93). Dr. Levy recommended "ESI

---

[11]Discectomy refers to "[e]xcision, in part or whole, of an intervertebral disk." See PDR Med. Dict. 550 (3d ed. 2006).

[12]Soma is the "trademark for combination of preparations of carisoprodol and aspirin." See Dorland's Illustrated Med. Dict., 1759 (31st ed. 2007). Carisoprodol is "a centrally acting skeletal muscle relaxant, for the symptomatic management of acute, painful musculoskeletal disorders, administered orally." Id. at 301.

[13]Percocet is a combination of Oxycodone and Acetaminophen. Ocycodone is an opioid analgesic indicated for relief of moderate to moderately severe pain. It can produce drug dependence. See Phys. Desk. Ref. 1114 (60th ed. 2006).

[14]Vicodin is a narcotic analgesic indicated for relief of moderate to moderately severe pain. Dependence or tolerance may occur. See Phys. Desk. Ref. 530-31 (60th ed. 2006).

or SI injections for [her] lumbar symptoms[,] pain management for control of [her] pain medications[, and] Neurontin[15] for nerve pain." (Tr. 293).

On February 6, 2007, plaintiff saw Stephen Granberg, M.D., at Pain Management Services (PMS), complaining of pain in her lower back and legs. (Tr. 232). Dr. Granberg noted that plaintiff underwent "a L4-L5 and L5-S1 lumbar fusion [that] help[ed] with the pain and numbness radiating into her feet and leg." Id. Plaintiff reported pain in her right hip, explained that she could not attend therapy because of her financial situation. Id. Plaintiff was "taking [two] Vicodin 5/500 approximately . . . every four hours along with . . . Soma at bedtime and Neurontin." (Tr. 232). Dr. Granberg assessed plaintiff with lumbar post laminectomy syndrome and lumbar radicular pain. (Tr. 233).

On February 26, 2007, Janie Vale, M.D., a state agency medical consultant, examined plaintiff and completed a Physical Residual Functional Capacity Assessment. (Tr. 18, 42, 226-31). Dr. Vale found that plaintiff could (1) occasionally lift ten pounds, climb, crouch, or crawl; (2) frequently lift ten pounds and balance; (3) stand and/or walk for at least two hours in an eight-hour workday; (4) sit for approximately six hours in an eight-hour workday; and (5) had an unlimited ability to push and/or pull. (Tr. 227, 229). Plaintiff exhibited no manipulative, visual, communicative limitations. (Tr. 229). Dr. Vale recommended that plaintiff "[a]void vibration and impact exposures to the LS spine[.]" (Tr. 230). Based on her physical examination and plaintiff's medical records, Dr. Vale determined that plaintiff retained a residual functional capacity to perform sedentary work. (Tr. 228).

---

[15]Neurontin is the "trademark for preparations of gabapentin," which is "an anticonvulsant that is a structural analog of γ-aminobutyric (GABA), used as adjunctive therapy in the treatment of partial seizures; administered orally." See Dorland's Illustrated Med. Dict. 1287, 764 (31st ed. 2007).

On March 5, 2007, Kevin Coleman, M.D., saw plaintiff at PMS and assessed her with lumbar post laminectomy syndrome and lumbar radicular pain. (Tr. 237). On April 6, 2007, Dr. Granberg refilled plaintiff's prescription for Norco. (Tr. 240). On April 11, 2007, plaintiff saw Dr. Granberg who noted that plaintiff's condition remained the same, except for occasional nausea and headaches. (Tr. 241). Upon examination, Dr. Granberg recommended that plaintiff continue taking Norco, Soma, Zenaflex,[16] and Neurontin as well as a trial prescription of Fiorinal[17] with codeine for her headaches. (Tr. 242).

On May 2, 2007, Dr. Granberg saw plaintiff and assessed her with lumbar post laminectomy syndrome, chronic lumbalgia, cervicalgia, thoracic spine pain, and left shoulder degenerative joint disease. (Tr. 246). Plaintiff received a caudal epidural, trigger point, and shoulder injections. Id.

On June 4, 2007, Dr. Granberg determined that plaintiff's condition remained the same. (Tr. 252-53). Plaintiff received a trial dose of bilateral L4-L5 and L5-S1 facet joint injections as well as trigger-point injections to the left cervical paraspinous musculature. (Tr. 252).

On June 13, 2007, plaintiff called PMS, requesting an appointment to determine the cause of her migraine headaches. (Tr. 260). Plaintiff visited PMS and complained of lower back pain and migraine headaches on July 2, 2007. (Tr. 261). Dr. Granberg determined that plaintiff's gait was antalgic, she ambulated with a cane, and her motor and sensory systems were grossly intact. (Tr. 262). On July 30, 2007, Dr. Granberg noted that plaintiff's condition remained the same, and recommended that she take

---

[16]Zanaflex is the "trademark for a preparation of tizanidine hydrochloride." See Dorland's Illustrated Med. Dict. 2119 (31st ed. 2007).

[17]Fiorinal is the "trademark for combination preparations of butalbital, aspirin, and caffeine." See Dorland's Illustrated Med. Dict. 717 (31st ed. 2007).

Zanaflex, Fiorinal, Norco, Soma, and Neurontin. (Tr. 264-65). In August 2007, September 2007, and October 2007, Dr. Granberg examined plaintiff, and noted no significant changes. (Tr. 267-70, 272-73).

On November 2, 2007, plaintiff was seen at Patients First Health Care (PFHC), complaining of depression, back pain, anxiety attacks, and insomnia. (Tr. 315). The record indicates that "Effexor[18] [had] been helpful for [plaintiff's] depression[,] but [that] she had been hit with a lot of situational stressors including the loss of her home, bankruptcy, etc." Id.

In December 2007 and January 2008, Dr. Granberg saw plaintiff at PMS. (Tr. 277-78, 285-88). On February 18, 2008, plaintiff was seen at PFHC and assessed with back pain with radiculopathy. (Tr. 314). The medical records also indicate that plaintiff suffered multiple ruptured discs from her fall in September 2005, walked with a cane, and clonus in her legs after standing for extended periods of time. Id.

On May 1, 2008, a PFHC physician determined that plaintiff suffered from depression and anxiety, crying spells, gastroesophageal reflux disease, abdominal pain, back pain, and hypertension. (Tr. 313). On June 6, 2008, Dr. Levy examined plaintiff and determined that she had full painless motion of her neck and lumbar spine as well as normal muscle tone in all of her extremities. (Tr. 297). Dr. Levy diagnosed plaintiff with failed back syndrome. (Tr. 298).

## IV. The ALJ's Decision

The Administrative Law Judge made the following findings:

1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2005.

---

[18]Effexor, or Venlafaxine, is indicated for the treatment of major depressive disorder. See Phys. Desk Ref. 3196 (63rd ed. 2009).

-11-

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of September 29, 2005 through her date last insured of December 31, 2005 (20 CFR 404.1520(b) and 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe impairment: lumbar disc disease (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform the full range of sedentary work.

6. Through the date last insured, the claimant was unable to perform past relevant work.

7. The claimant was born on February 11, 1963 and was 42 years old, which is defined as a younger individual, age 18-44, on the date last insured (20 CFR 404.1563).

8. The claimant has a high school education and communicates in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules directly supports a finding of "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1560(c) and 404.1566).

11. The claimant was not under a disability as defined in the Social Security Act, at any time from September 29, 2005, the alleged onset date, through December 31, 2005, the date last insured (20 CFR 404.1520(g)).

(Tr. 15-16, 19).

## V. Discussion

To be eligible for disability insurance benefits, a claimant must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382 (a)(3)(A) (2000). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process, "under which the ALJ must make specific findings." Nimick v. Sec'y of Health and Human Services. 887 F.2d 864 (8th Cir. 1989). The ALJ first determines whether the claimant is engaged in substantial gainful activity. If the claimant is so engaged, dhe is not disabled. Second, the ALJ determines whether the claimant has a "severe impairment," meaning one which significantly limits her ability to do basic work activities. If the claimant's impairment is not severe, she is not disabled. Third, the ALJ determines whether the claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment is, or equals, one of the listed impairments, she is disabled under the Act. Fourth, the ALJ determines whether the claimant can perform her past relevant work. If the claimant can, she is not disabled. Fifth, if the claimant cannot perform her past relevant work, the ALJ determines whether she is capable of performing any other work in the national economy. If the claimant is not, she is

disabled. See 20 C.F.R. §§ 404.1520, 416.920 (2002); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

### A. Standard of Review

The Court must affirm the Commissioner's decision, if the decision "is supported by substantial evidence on the record as a whole." Gladden v. Callahan, 139 F.3d 1219, 1222 (8th Cir. 1998), quoting Smith v. Schweiker, 728 F.2d 1158, 1161 (8th Cir. 1984). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002), quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001). To determine whether the Commissioner's decision is supported by substantial evidence, the Court "must take into account whatever in the record detracts from its weight." Gladden, 139 F.3d at 1222, quoting Smith v. Schweiker, 728 F.2d at 1162. The Court may not reverse merely because the evidence could support a contrary outcome. Estes, 275 F.3d at 724. In determining whether the Commissioner's decision is supported by substantial evidence, the Court reviews the entire administrative record, considering:

1. The ALJ's credibility findings;

2. the plaintiff's vocational factors;

3. the medical evidence;

4. the plaintiff's subjective complaints relating to both exertional and nonexertional impairments;

5. third-party corroboration of the plaintiff's impairments; and

6. when required, vocational expert testimony based on proper hypothetical questions, setting forth the claimant's impairment.

See Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992).

The Court must consider any evidence that detracts from the Commissioner's decision. Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial evidence. Pearsall, 274 F.3d at 1217, citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

B. **Plaintiff's Allegations of Error**

Plaintiff contends that the ALJ failed to properly consider her residual functional capacity (RFC). Plaintiff also claims that the ALJ erred by relying on the Medical Vocational Guidelines (the "grids"),[19] arguing that she suffered from a significant non-exertional impairment of pain, which required the ALJ to consider the testimony of a vocational expert.

1. The ALJ's Residual Functional Capacity Determination

The RFC is the most that a claimant can do despite physical or mental limitations. Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004); 20 C.F.R. § 404.1545. It is the claimant's burden, rather than the Commissioner's, to prove the claimant's RFC. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). It is the ALJ's responsibility to determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own description of his limitations. Id. Ultimately, however, the determination of residual functional capacity is a medical issue, Singh v. Apfel, 222

---

[19]The SSA developed the grids. Hunt v. Heckler, 748 F.2d 478, 480 (8th Cir. 1984) (citations omitted). "These guidelines contain tables called 'grids' which contain various combinations of RFC's and other criterion. The grids are used by the [SSA] to determine whether a claimant is disabled." Id. See also 20 C.F.R. Pt. 404, Subpt. P. App. 2.

F.3d 448, 451 (8th Cir. 2000), which requires the consideration of supporting evidence from a medical professional, Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

The Court begins with plaintiff's argument that the ALJ failed to consider all the medical evidence subsequent to the expiration of her insured status. (Doc. #14, at 11-16). To be eligible for disability insurance benefits under Title II, plaintiff must establish that she was disabled before her insurance expired on December 31, 2005. Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006); Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997); 20 CFR § 404.130. "When an individual is no longer insured for Title II disability purposes, [the Court] will only consider an individual's medical condition as of the date she was last insured." Long, 108 F.3d at 187 (citation omitted). "Evidence from outside the insured period can be used in 'helping to elucidate a medical condition during the time for which benefits might be rewarded.'" Cox, 471 F.3d at 907. Here, plaintiff's insured status expired on December 31, 2005. Therefore, the ALJ was not required to consider the medical evidence and opinions dated after that date.

Plaintiff next argues that the ALJ erred by relying on the opinion of Dr. Vale. Specifically, plaintiff claims that "[t]he record indicates that [Dr.] Vale is a medical consultant, but [it] does not indicate [her] status as a medical doctor, an osteopathic doctor[,] or a licensed psychologist." (Doc. #14, at 13). Plaintiff's contention is without merit. The record clearly reveals that Dr. Vale is a state agency medical physician. See (Tr. 42).

Plaintiff also contends that the ALJ erred by giving substantial weight to the opinion of Dr. Vale. Plaintiff asserts that "nonexamining consulting physicians are not considered substantial evidence upon which [an ALJ's] decision may rest." (Doc. #14, at 14). As stated above, in determining the RFC, the ALJ must consider all relevant

-16-

evidence, including medical records, observations of treating physicians and others, and the claimant's own description of his limitations. Pearsall v. Massanari, 274 F.3d 1211, 1217. Here, the ALJ noted that plaintiff's insured status expired on December 31, 2005. (Tr. 15). The ALJ explained that plaintiff was injured when she fell down the steps on September 28, 2005, and "was seen in an emergency room on September 28, 2005." (Tr. 17). The ALJ considered plaintiff's testimony, in which she reported that:

> Her husband had to take care of the children. Pain medication [was] not helping her. Eventually she had back surgery, but it did not help at all. . . . She [felt] like she [was] being stabbed with a pitchfork. On a 1-10 scale, her pain [was] a 10. Sometimes she use[d] a walker. When she [did] the dishes, she [sat] on a stool. She [did] not do much around the house. . . . Since she fell, she has never felt well enough to work.

(Tr. 17). The ALJ then determined that plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [were] not entirely credible" based on the medical evidence. (Tr. 17). The ALJ noted that the x-rays taken the day of plaintiff's fall revealed no abnormalities in her cervical spine, pelvis or right hip. Id. The ALJ also considered the results of the October 3, 2005 MRI of plaintiff's lumbar spine that "showed posterior disc bulging with left lateral foraminal disc protrusion and central disc protrusion at L5-S1." Id. This MRI also revealed that there was "[n]o significant abnormalities . . . at L1-L2, L2-3, L3-4, or L3-4." (Tr. 169). Then, the ALJ considered the opinion of Dr. Vale. The record indicates that, after a physical examination of plaintiff and a review of her medical records, Dr. Vale opined that plaintiff was capable of performing sedentary work. (Tr. 42, 226-31). The ALJ noted that "there [were] no contrary expert opinions of [plaintiff]'s functioning through her date last insured, and [that] Dr. Vale's assessment [was] consistent with the objective [medical] evidence." (Tr. 18). The Court believes that the ALJ properly discounted

plaintiff's complaints, and considered her entire medical record, including Dr. Vale's opinion.

Finally, plaintiff argues that the silence of her treating physician, Dr. Levy, demonstrates that the ALJ's RFC determination is not supported by substantial evidence. To support her contention, plaintiff cites to Hutsell v. Massanari, 259 F.3d 712 (8th Cir. 2001). In Hutsell, the claimant experienced psychotic episodes and received ongoing treatment. Id. at 712. Two consulting psychiatrists examined the plaintiff, and "concluded that [the plaintiff]'s capacity for sustained employment [was] nonexistent." Id. Upon examination of the plaintiff and review of her medical records, a consulting psychologist "concluded that [she] was seriously limited in most areas of work-related performance and had no useful ability to function in the areas of dealing with work stress and maintaining concentration and attention." Id. Despite the consultants' medical opinions, the ALJ determined that the plaintiff was "only slightly impaired" because she was "doing well" in her treatment program. Id. The Eighth Circuit held that "the ALJ's residual functional capacity assessment was not properly informed and supported by 'some medical evidence' in the record[.]" Id. The instant case is distinguishable from Hutsell because, here, the ALJ's RFC determination is consistent with the medical evidence dated before December 31, 2005 and with the opinion of Dr. Vale.

Based on the foregoing, the Court finds that the ALJ's RFC determination was supported by substantial evidence in the record.

2. The ALJ's Reliance on the Medical-Vocational Guidelines (Grids)

Finally, plaintiff argues that the ALJ erred by relying on the grids, instead of obtaining the testimony of a vocational expert to establish that she was not disabled. (Doc. #14, at 16).

"An ALJ may rely on the grids to find a plaintiff not disabled[,] where the plaintiff does not have non-exertional impairments[,] or where the non-exertional impairment does not diminish the plaintiff's RFC to perform the full range of activities listed in the grids." Washington v. Astrue, 2009 WL 3164080, at *8 (E.D. Mo. Sept. 29, 2009) (citing Muncy v. Apfel, 247 F.3d 728, 735 (8th Cir. 2001) (citing Holz v. Apfel, 191 F.3d 945, 947 (8th Cir. 1999)). "However, when a claimant is limited by a non-exertional impairment, such as pain or mental incapacity, the Commissioner may not rely on the [g]rids and must instead present testimony from a vocational expert to support a determination of no disability." Washington v. Astrue, 2009 WL 3164080, at *8 (citing Gray v. Apfel, 192 F.3d 799, 802 (8th Cir. 1999)).

Upon careful review of the record, the Court concludes that plaintiff suffered from no nonexertional limitations. Plaintiff argues that her pain was a nonexertional limitation. However, as stated above, the ALJ properly discounted plaintiff's "statements concerning the intensity, persistence and limiting effects of" of her pain. (Tr. 17). Plaintiff complained that her pain was a ten on a ten-point scale, she walked with a cane, and that "she never felt well enough to work." Id. However, the x-rays of plaintiff's cervical spine, hips, and elbows, taken the day of her fall, revealed no abnormalities. Although the October 3, 2005 MRI indicated some disc bulging and protrusion, the February 18, 2006 MRI revealed that the disc protrusion remained unchanged, but that the disc bulging had regressed. Id. Furthermore, the record contains no medical opinions dated before December 31, 2005 that indicate that plaintiff's pain limited her ability to work. Because plaintiff suffered from no nonexertional limitations, the ALJ properly relied on the grids.

## VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in the brief in support of her complaint [Doc. #18] is **denied**.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 13th day of August, 2010.